# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

JERMELLA FIGGS,
on behalf of minor child, J.J.B.,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 1:17-cv-481

Dlott, J.
Bowman, M.J.

## REPORT AND RECOMMENDATION

Plaintiff Jermella Figgs filed this Social Security appeal in order to challenge the Defendant's finding that her minor child (hereinafter "JJB") is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. The Commissioner filed a response, to which Plaintiff filed a reply. As explained below, the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

**I. Background**

In October 2012, Plaintiff filed an application for Supplemental Security Income (SSI) on JJB's behalf, alleging a disability on July 1, 2009 primarily due to a brain injury caused by an aneurism at age eight, and a subsequent tumor.[1] After the application was denied initially and upon reconsideration, Plaintiff requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). An evidentiary hearing was held on December 11,

---

[1] SSI benefits may not be awarded for any period prior to the month in which the claimant filed an application. *See* 20 C.F.R. §§415.330, 416.335. Thus, the relevant disability period is the month in which Plaintiff's mother filed her application through the date of the ALJ's decision. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1244 (6th Cir. 1993).

2015 before ALJ Kevin Detherage. JJB, who was then 15 years old, and her mother both testified. (See Tr. 37-92). On March 23, 2016, the ALJ denied Plaintiff's SSI application in a written decision. (Tr. 16-32). On June 6, 2017, the Appeals Council denied Plaintiff's request for further review, leaving the ALJ's decision as the final decision of the Commissioner.

The ALJ found that JJB has severe impairments of right temporal cavernous malformation, a history of aneurysm, headaches, and asthma. (Tr. 22). Considering those impairments, the ALJ found that JJB functionally experiences a marked limitation in only one relevant area or domain of her life – health and physical well-being. The ALJ determined that although JJB has other limitations, those limitations are "less than marked." (Tr. 25). Because JJB has only one area of "marked" limitation, the ALJ concluded that JJB was not under disability, as defined in the Social Security Regulations, and was not entitled to SSI. (Tr. 31).

On appeal to this Court, Plaintiff first argues that the ALJ erred by failing to find that JJB did not meet or equal a Listing. As a second assignment of error, Plaintiff argues that JJB has marked limitations in at least two domains, such that her limitations are the functionally equivalent to a Listing.

**II. Analysis**

**A. Standard of Review**

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. See 42 U.S.C. §1382c(a). An individual under the age of eighteen will be considered to be under a disability if the child has a medically determinable impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last,

for a continuous period of not less than 12 months. *See* 42 U.S.C. §1382c(a)(3)(C)(i). The implementing regulations define the standard of "marked and severe functional limitations" in terms of "listing-level severity." *See* 20 C.F.R. §§416.902, 416.906, 416.924a, 416.926.

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income by a person under the age of 18, the Social Security Agency is guided by a three-step sequential benefits analysis. In this case, the first two steps of that analysis are uncontested. At Step 1, the Commissioner asks if the claimant is performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are severe. JJB

3

has not engaged in substantial gainful activity and has multiple severe impairments. (Tr. 22). Therefore, Steps 1 and 2 are satisfied.

At Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments. *See* 20 C.F.R. §§ 416.924, 416.925 and 416.926. The ALJ concluded that none of JJB's impairments, alone or in combination, met or medically equaled a Listed Impairment that would entitle JJB to a presumption of disability.

### B. Plaintiff's Claims

#### 1. Plaintiff Does Not Meet or Equal Any Listing

New counsel represents Plaintiff in this judicial appeal. As new counsel concedes, at the administrative hearing Plaintiff's prior attorney never argued that JJB met or equaled any Listing but instead argued <u>only</u> that she was disabled through "functional equivalence" because she had "marked limitations" in two domains.

> For reasons which are unclear, the prior representative, Mr. O'Brien, did not directly argue[] that either Listing 111.05 or Listing 112.02 were met or equaled. Rather, Mr. O'Brien on a pre-hearing basis primarily if not indeed exclusively argue[d] that the child's condition functionally equaled the Listings in that she had "marked impairment" in at least two of the domains of functioning described in 20 C.F.R. § 416/926(a).

(Doc. 9 at 8). A review of the hearing transcript and prehearing brief confirms that prior counsel informed the ALJ that he was <u>not</u> suggesting that JJB met or equaled any Listing other than through functional equivalence. (*See, e.g.* Tr. 90, arguing that JJB's limitations functionally equaled a Listing because of marked impairments in two domains, but appearing to state that he was "not claiming" that she otherwise met or equaled a Listing).[2]

---

[2]The Commissioner has not argued any type of waiver.

4

Despite the lack of any argument by Plaintiff's former counsel that JJB met or equaled a Listing, the ALJ was required to consider any applicable Listings in the course of his sequential analysis, and specifically considered Listings 103.03 (asthma), 111.05 (brain tumors), and 112.02 (organic mental disorders). With respect to the latter two Listings, the ALJ wrote:

> The record …fails to show that the claimant's impairments resulted in seizures, motor dysfunction, or communication impairment, and examinations generally show symmetric rapid alternating movements, normal finger to nose, and normal gait and station (7F/28; 12F/3-4). Although the record shows some impairment of cognitive functioning based on below average full scale IQ scores, the evidence discussed in more detail below fails to show marked impairment in cognitive/communicative functioning, social functioning, personal functioning, or maintaining concentration, persistence, or pace (1F/2-3; 8F/2, 11-12; 13F/2-4).

(Tr. 22). In her Statement of Errors before this Court, Plaintiff argues that the ALJ erred in finding that JJB did not meet or equal Listing 111.05 or Listing 112.02.

I find no error, because substantial evidence supports the ALJ's determination that JJB did not meet or equal either Listing. In order to be entitled to the presumption of disability under a Listing, a claimant has the burden to demonstrate that she has a condition that meets, or is equal in severity, to each and every element of a listed impairment. *See Sullivan v. Zebley*, 110 S. Ct. 885, 891 (1990). State consulting experts opined that JJB did not meet or equal a Listing, (Tr. 97, 109), and no medical source opined to the contrary. The consultants specifically evaluated Listings 111.05 and 112.02, (Tr. 96-97, 107), and the ALJ assigned their opinions "great weight." (Tr. 25).

Plaintiff cites to virtually no evidence to support the argument in her Statement of Errors that JJB meets or equals Listing 111.05 (brain tumors). The Commissioner sets forth ample argument why JJB did not meet that Listing. In Plaintiff's reply, she concedes the point as to Listing 111.05. (Doc. 14 at 1, n.1).

5

Although Listing 112.02 appears to be more relevant to JJB's limitations, substantial evidence also supports the ALJ's conclusion that JJB also fails to meet or equal that Listing. In order to satisfy Listing 112.02, Plaintiff was required to show that JJB met the criteria listed in subsections A and B.[3] The current version of Listing 112.02 has replaced the phrase "organic brain disorders" with "Neurocognitive disorders" and sets forth the criteria for subsection A as follows:

> Neurocognitive disorders (112.02).
>
> a. These disorders are characterized in children by a clinically significant deviation in normal cognitive development or by a decline in cognitive functioning. Symptoms and signs may include, but are not limited to, disturbances in memory, executive functioning (that is, higher-level cognitive processes; for example, regulating attention, planning, inhibiting responses, decision-making), visual-spatial functioning, language and speech, perception, insight, and judgment.
>
> b. Examples of disorders that we evaluate in this category include major neurocognitive disorder; mental impairments resulting from medical conditions such as a metabolic disease (for example, juvenile Tay–Sachs disease), human immunodeficiency virus infection, vascular malformation, progressive brain tumor, or traumatic brain injury; or substance-induced cognitive disorder associated with drugs of abuse, medications, or toxins….
>
> c. This category does not include the mental disorders that we evaluate under intellectual disorder (112.05), autism spectrum disorder (112.10), and neurodevelopmental disorders (112.11).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Plaintiff contends that JJB met the criteria of subsection A, because she alleges JJB had "[m]edically documented persistence" of at least one of ten enumerated cognitive areas, using phrasing and definitions provided in a prior version of the Listing.[4]

---

[3] Alternatively, a claimant can show the presence of criteria in both A and C of the Listing, but Plaintiff argues only that she met the criteria of A and B.

[4] Plaintiff (incorrectly) cites the prior version of Listing 112.02 that was in effect from August 12, 2015 to May 23, 2016, at the time the ALJ issued his decision.

Specifically, she argues that JJB had "developmental delay or regression," "memory impairment," "impairment of cognitive function as measured by standardized psychological testing" and "disturbance of concentration, attention or judgment." (Doc. 9 at 10-11, citing prior version of Listing 112.02).

Relying upon the same evidence and the prior version of the Listing, she argues that she also met the B criteria. The Paragraph B criteria of the current version of Listing 112.02 requires marked impairment in at least two functional areas:

> For children ages 3 to 18, these criteria represent the areas of mental functioning a child uses to perform age-appropriate activities. They are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself…. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function age-appropriately in a manner comparable to that of other children your age who do not have impairments. (Hereinafter, the words "age-appropriately" incorporate the qualifying statement, "in a manner comparable to that of other children your age who do not have impairments.") To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 112.05 and 112.14.)

*See* Listing 112.00 Mental Disorders, 20 C.F.R. Pt. 404, Subpt. P, App. 1.[5]

Unfortunately for Plaintiff, SSI childhood Listings were substantially revised effective March 27, 2017 in a manner that is arguably less favorable to her claim. Plaintiff criticizes the Commissioner for relying on the current version of Listing 112.02, but it is Plaintiff who is incorrect in her reliance on the prior version. Although earlier versions were in effect at the time Plaintiff filed her initial application and at the time of the

---
[5]Plaintiff again cites the prior version of Listing 112.02(B), which contained somewhat different language but generally required marked impairment in at least two of four categories: cognitive/communicative function, social functioning, personal functioning, and concentration, persistence, or pace.

ALJ's decision, the Appeals Council expressly stated that it applied the "regulations and rulings in effect as of the date we took this action." (Tr. 1). Since the June 6, 2017 Appeals Council decision occurred after the revised Listing 112.02 went into effect, the revised version controls. *See Brandenburg v. Astrue*, Case No. 3:09-cv-349, 2010 WL 2621254 (S.D. Ohio June 3, 2010). Thus, even though Plaintiff filed her application prior to the revision of Listing 112.02, the most recent version is applicable to her claim. *Accord Combs v. Com'r*, 459 F.3d 640 (6th Cir. 2006).

In any event, under the version of Listing 112.02 then in effect, the ALJ found some evidence of impairment of cognitive functioning based on below-average full scale IQ scores, but noted that other evidence did not show marked impairments in cognitive/communicative functioning, social functioning, personal functioning, or maintaining concentration, persistence or pace. (Tr. 22). The ALJ cited numerous examples, including a July 2011 neuropsychological assessment by Abigail Johnson, Ph.D. that stated that JJB enjoys social interaction, and that standardized cognitive testing revealed average verbal abilities, average brief attention and memory, borderline on nonverbal reasoning, and average sequencing and cognitive flexibility. (Tr. 22, citing Tr. 306-307). Her sixth-grade report card indicated she was enjoyable to have in class, performing above grade level in science, getting As in gym class, art, and band, and Bs in social studies and science (Tr. 832). Her Individualized Education Plan ("IEP") indicated she did not need accommodations for special transportation. A subsequent neuropsychological report by Cynthia Austin, Ph.D., dated February 2016, showed improvement in several areas, including reading and math calculation scores. (Tr. 1147). The 2016 report indicated average verbal and non-verbal reasoning, with high average

8

working memory. (Tr. 1146). Visual memory was high average and also reflected improvement from the prior testing. (Tr. 1147).

Plaintiff argues that the ALJ erred by "selectively" citing to the 2011 psychoneurological report.[6] Plaintiff maintains that Dr. Johnson's finding in the same report that JJB's attention and behavior regulation "were remarkable for distractibility, motor restlessness, hyperactivity and moderate impulsivity," and that she "became easily distracted" are proof that she satisfies Listing criteria. The 2011 report also described JJB's work style as "slow" and stated that "she was noted to become fatigued by the end of the afternoon," such that several breaks were required throughout the testing. (*Id.* at 305-306). However, other than observing the existence of some distractability, hyperactivity and "moderate" impulsivity, Dr. Johnson did not characterize or quantify the degree of limitation at Listing level severity, nor did she translate her findings into any specific functional limitations.

Without citation to any particular pages of the school records, Plaintiff additionally argues that, contrary to her report card, "school records, taken as a whole, document…the child's problems with cognitive function and with impaired concentration and attention." (Doc. 9 at 12). Last, Plaintiff accuses the ALJ of being equally "selective" with his citation to the 2016 neuropsychological report and argues that the ALJ "ignor[ed]" pages 5 through 8 of that report. (*Id.* at 13).

Having closely reviewed the cited "school records" as a whole, as well as both 2011 and 2016 neuropsychological reports, the undersigned finds no error. The ALJ's

---

[6]Unfortunately, portions of the 2011 report are illegible in the administrative record available to the undersigned, as the copy included in the record is of poor quality, with several sentences "blacked out" presumably due to the use of a highlighter over text that Plaintiff may have intended to emphasize. (*See* Tr. 306). However, neither party appears to dispute the contents of the report, which have been summarized by the parties and by the ALJ, and are partially restated in the 2016 report.

analysis is substantially supported by the referenced records and the record as a whole. The limited evidence on which Plaintiff relies is not sufficient to establish Listing level severity. Medical equivalence is a medical determination; neither Dr. Johnson nor any other medical expert opined that JJB had impairments that equaled the severity of Listing 112.02 or any other Listing. To the contrary, the only medical experts who offered opinions on that issue agreed that JJB did not satisfy Listing criteria. (Tr. 24, 97, 108).

## 2. Plaintiff Did Not Show Functional Equivalence to a Listing

In her second and closely related claim, Plaintiff argues that JJB's impairments "functionally equal" a Listed impairment. To determine functional equivalence, the Commissioner is required to assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. §416.926a(b)(1). To prove functional equivalence to a Listing, Plaintiff must show that JJB's impairments resulted in "marked" limitations in at least two of the six domains, or that her impairments were "extreme" in at least one of the domains. 20 C.F.R. §416.926a(d). As stated, the ALJ determined that JJB's limitations were "marked" in just one area – the domain of health and physical well-being. The ALJ noted that JJB has undergone brain surgery and continues to suffer from frequent headaches and persistent fatigue. In addition, she has asthma that requires the use of an inhaler. Plaintiff admits that the finding of "marked" limitation in the domain of health and physical well-being is "well supported by substantial evidence." (Doc. 9 at 14, emphasis added). I agree.[7]

---

[7] In her Statement of Errors, Plaintiff implies that the ALJ might have found "extreme" limitation in this area. A finding of a single "extreme" limitation will entitle a claimant to benefits. In her reply memorandum, Plaintiff more forcefully argues that a "compelling case can be made for the proposition that the child's impairment

10

Plaintiff's claim rests on the ALJ's finding of "less than marked" limitation in the domains of acquiring and using information, and in attending and completing tasks. Again, I find no error.

**a. "Less Than Marked" Limitation in Acquiring and Using Information**

"Marked limitation" exists when the child's impairment "interferes seriously" with the ability to independently initiate, sustain, or complete activities, regardless of whether the impairment limits only one activity in the domain, or several activities. The interactive and cumulative effects of a child's impairments must be considered; both relevant regulations and several social security rulings also require the Commissioner to consider the "whole child" in making findings regarding functional equivalence. 20 C.F.R. §415.926a(b) and (c); *see also generally* SSR 09-1p. Relevant to Plaintiff's challenge in this case, a "marked" limitation is defined as a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. §416.926a(e)(2).

A valid score on a comprehensive standardized test designed to measure ability or functioning in a domain, that is at least two standard deviations (but less than three) below the norm for the test, indicates a "marked" limitation, provided the child's day-to-day functioning in domain-related activities is consistent with the score. 20 C.F.R. § 416.926a(e)(2)(iii). However, regulations confirm that test scores standing alone do not prove either "marked" or "extreme" impairment. 20 C.F.R. §416/026a(e)(4). Thus, marked limitation may still be found even though test scores are "slightly higher" than the typically defined "marked" levels, if the record shows that the child's functioning is seriously or very seriously limited by the impairments. *See* 20 C.F.R. § 416.926a(e)(4(A).

---

in this particular domain was indeed 'extreme' and not just 'marked.'" (Doc. 14 at 7). However, this Court will not reverse an ALJ when a finding is supported by substantial evidence, even if substantial evidence could (theoretically) support a different result.

11

At the same time, test scores that meet the criteria will not be sufficient to show marked or extreme limitation, if the record shows a level of day-to-day functioning that is not seriously or very seriously limited by the impairments. 20 C.F.R. § 416.926a(e)(4)(B).

In reviewing the referenced domain of acquiring and using information, the ALJ discussed all relevant standards to evaluate "how well a child is able to acquire or learn information, and how well a child uses the information she has learned." (Tr. 25). As the ALJ noted, the domain involves how well children perceive, think about, remember, and use information in all settings, including their daily activities at home, at school, and in the community. (Tr. 25, citing 20 C.F.R. §416.926a(g) and SSR 09-3p). The ALJ appropriately reviewed what information a school age child (age 6-12) without an impairment should be able to acquire and use, as well as what an adolescent child should be able to demonstrate in the domain of acquiring and using information, since JJB transitioned between those two age categories between the time when the application was filed on her behalf and the date of the evidentiary hearing. (Tr. 25-26). The ALJ also reviewed Social Security regulation 20 C.F.R. §416.926a(g)(3) and SSR 09-3p, which provide examples of the types of limited functioning in the referenced domain that a child may have over a range of ages and developmental periods. (Tr. 26).

In contrast to a child with no limitations, examples of difficulty a child with limitations may have include:

> (i) does not understand words about space, size, or time (e.g., in/under, big/little, morning/night); (ii) cannot rhyme words or the sounds in words; (iii) has difficulty recalling important things learned in school yesterday; (iv) does not use language appropriate for age; (v) is not developing 'readiness skills' the same as peers (e.g. learning to count, reciting ABC's, scribbling); (vi) has difficulty comprehending written or oral directions; (vii) struggles with following simple instructions; (viii) has difficulty solving mathematics questions or computing arithmetic answers; or (ix) talks only in short, simple sentences, and has difficulty explaining what she means.

12

(Tr. 26, citing 20 C.F.R. §416.925a(g)(2)(iv) and SSR 09-3p). However, the regulations "recognize that limitations of any of the activities in the examples do not necessarily mean that a child has a 'marked' or 'extreme' limitation." 20 C.F.R. § 416.926a

In finding that JJB has "less than marked" limitation in this domain, the ALJ provided the following analysis:

> Testing shows a full scale IQ of 84, and the claimant demonstrates low average skills for her grade level…. However, she stated that she is generally capable of improving her grades when they fall into the "C" and "D" range, and a recent neuropsychological evaluation demonstrates improved scores compared to her prior evaluation, which indicates age appropriate functioning or only mild impairment in most area…. The overall record shows that the claimant's restrictions in this domain are not at a "marked" level of severity.

(Tr. 26). The ALJ acknowledged that Plaintiff had some below-average skills for her grade level, but also noted that she worked to improve her grades when they fell to C or D range. (Tr. 26, citing Tr. 305-306, 868, 1146-1148). In addition, the ALJ appropriately relied upon and gave "great weight" to consulting experts who opined that JJB did not have marked impairment in this domain. (Tr. 24, 97, 108). No physician or consulting expert opined to the contrary.

Plaintiff argues that the fact that JJB functions below grade level even with an IEP demonstrates "marked" impairment. It does not. Virtually every child with an IEP functions below grade level in some subjects.[8] The fact that JJB has some level of impairment does not mean that it is marked. Plaintiff also maintains that the ALJ ignored the "overall import" of JJB's school records. In addition, Plaintiff argues that the ALJ focused too heavily on the 2016 neuropsychological evaluation "to the exclusion of all the medical records and school records from the past 5 years." (Doc. 9 at 16).

---

[8] JJB's mother testified that JJB was below grade level in some (but not all) subjects. (Tr. 23, citing Exhibit 4E/1-2).

13

Notably, Plaintiff again fails to cite to any specific record that she believes the ALJ ignored, either among the school records or the medical records. By contrast, the ALJ cited to numerous records including the 2011 neuropsychological report indicating that JJB enjoyed social interaction, and standardized cognitive testing that revealed average verbal abilities, average brief attention and memory, borderline on nonverbal reasoning, and average sequencing and cognitive flexibility. (Tr. 22, citing Tr. 306-307). JFF's sixth grade report card indicated she was performing above grade level in science, and earned a total of 8 "A's" and 4 "B's." (Tr. 832).

To support her argument, Plaintiff focuses mostly on select scores reflected in JJB's 2016 neuropsychological report. For example, although intelligence scores found verbal and non-verbal reasoning skills to be "average," her visual spatial skills and processing speeds fell in the "below average" range, at the 5th and 7th percentiles. (Tr. 1146). Additionally, in terms of academic skills, single word reading and math calculation scores remained in the "low average" range, (Tr. 1147), despite improvement over the "below average" range noted in the 2011 report. And both the 2011 and 2016 report classified JJB's academic math fluency as "impaired" because it was below the 2nd percentile. (*Id.*)

With respect to verbal/language test results, the 2016 report noted that JBB's total verbal reasoning and language scores were average, as was verbal fluency for categories. Verbal fluency was low average for initial letters. (*Id.*) However, within the same verbal/language category, the 2016 report noted that "[w]ord finding or confrontation naming showed some improvement compared to 2011, but overall remained impaired." (*Id.*)

14

In a separate category describing visual-spatial scores, the 2016 report reflects that JJB's score for copying geometric figures decreased in 2016 from 2011, although the same section of the report reports her visual constructional abilities fell in the "below average" range and visual matching was "low average" and an improvement over 2011. (*Id.*)

In terms of attention and executive functioning, Plaintiff points out that the 2016 report noted that JJB showed consistently slow speed and accuracy, and that her scores decreased to the "below average" range as tests became more difficult. (Tr. 1150). In the same section, however, the 2016 report describes her brief auditory attention as "average" and both visual and working memory as "in the <u>high</u> average range." (Tr. 24, 1147 (emphasis added)). The report notes that, despite JJB's average scores under the "ideal" testing conditions, JJB "meets criteria for ADHD-Inattentive" according to her mother's [Plaintiff's] report. Her mother also reported deficits in JJB's working memory and planning/organization at home. (*Id.*) Still, all of JJB's memory test scores were either "average" or "high average." (*Id.*) And in the category of processing speed, JJB's score improved in 2016 from the "impaired" level to the "below average" level, though Plaintiff emphasizes it was still "an area of weakness." (Tr. 1147).

Dr. Austin's conclusions were that JJB had "age appropriate" or "average" skills in verbal and nonverbal reasoning, verbal and visual memory, brief attention and working memory, as well as basic academic scores (which fell in the low average range). (Tr. 1148). However, she concluded that JJB was mildly to moderately impaired (defined by scores falling at the 7th percentile or below) in the areas of visual spatial skills, mental processing, attention and higher level executive skills, fine motor skills and word finding. (*Id.*)

15

Plaintiff now argues that this Court should find "as a matter of law…that an adolescent functioning at the 7th percentile or below" in the referenced functional areas equals "marked limitation" in "acquiring and using information." (Doc. 9 at 17).  However, Plaintiff fails to cite any authority for that proposition, and this Court finds none.  The regulations require not only scores, but the "equivalent of the functioning we would expect to find on standardized testing with scores" that are "at least two" standard deviations (for "marked") or "at least three standard deviations below the mean (for "extreme"). *See* 20 C.F.R. §416.926a(e)(2) (explaining that test scores below the mean must be consistent with "day-to-day functioning in domain-related activities."). Thus, to the extent that Plaintiff relies on carefully selected subscores, she must show that those scores reflect - at a minimum - two standard deviations below mean test scores.  There is no evidence that JJB's scores were defined in that manner, and the only medical testimony in the record characterized JJB's impairment as less than marked.  The assertion that a child's performance at a particular percentile, independent of standard deviations or functioning, is equivalent to marked limitation, is contrary to law.

Under the "whole child" approach required by SSR 09-1p, the ALJ's analysis is supported by substantial evidence.  The referenced scores are insufficient to overturn the substantial body of evidence that supports the ALJ's finding that Plaintiff experiences "less than marked" limitation in the domain of acquiring and using information, and the ALJ's analysis falls within the acceptable "zone of choice." The ALJ adequately discussed both JJB's overall scores and educational records.  There is no evidence that JJB has ever repeated a grade, and she remained in "regular" classes, even though she worked

with an intervention specialist in two core subjects.[9] Despite some poor grades, JJB's overall grades reflect mostly A's and B's, and she testified she would work harder and successfully raise her grades if they dropped too low. She also recognized when she was struggling and asked for help. (Tr. 255).

In addition, the domain of acquiring and using information is not limited to "academic" information but includes "how well children perceive, think about, remember, and use information in all settings, including their daily activities at home, at school, and in the community." The ALJ did not err by considering JJB's abilities to do household chores, understand instructions, maintain friendships, and get along with teachers, despite requiring extra time to complete her chores. (Tr. 23-24). The ALJ also noted that Plaintiff is well groomed and has no difficulty at all with caring for herself, despite her mother's testimony that she has difficulty completing daily tasks due to poor concentration. (Tr. 30). The "whole child" review not only permits but requires the ALJ to consider all relevant information under all relevant domains. SSR 09-1p.

This Court's review is limited to a determination of whether "substantial" evidence exists in the record as a whole, defined as consisting of "more than a scintilla of evidence but less than a preponderance." *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The ALJ's analysis easily meets that standard. *See also, generally Smith v. Com'r*, Case No. 1:14-cv-746-SJD, 2015 WL 9467684 (Doc. 13, R&R filed 12/2/15, adopted 12/28/15) (finding no error in ALJ's reasoning that child had "less than marked" limitation in acquiring and using information where child's IQ scores fell within borderline to low average range).

---

[9] Although Plaintiff does not argue the point, the ALJ also acknowledged that JJB had an educational assistant for social studies and science. (Tr. 24, 255, 841-42).

17

### b. Less Than Marked Limitation in Attending and Completing Tasks

Plaintiff further argues that the ALJ erred in finding "less than marked" limitation in the domain of attending and completing tasks. The referenced domain "refers to a child's ability to avoid impulsive thinking and her ability to prioritize competing tasks and manage her time." (Tr. 27, citing 20 C.F.R. § 416.926a(h) and SSR 09-4p).

In finding "less than marked" limitation in this domain, the ALJ reasoned:

> Education records indicate that the claimant is distractible and works slowly (8F/6/ 11F/10). However, she is taught in a regular classroom and only requires an intervention specialist in language arts and math classes…. Although the claimant continues to have some problems focusing, she recognizes when she loses track and is capable of asking questions when she does not understand[] a concept (14E/6). The record overall establishes some limitations in this domain, but they do not rise to the level of "marked" restriction.

(Tr. 27). The ALJ also fairly considered Plaintiff's testimony that JJB was able to do household chores and understand instructions, and that she enjoys dancing. (Tr. 23, 74-75, 200-01). JJB herself testified that she had been part of the color guard team during her 6th, 7th and 8th grade school years.

Plaintiff relies on the same school records to argue that JJB was "distractible" and "worked slowly." She maintains that the ALJ minimized JJB's need for an intervention specialist in the "most important" subjects in school. Plaintiff posits that the mere fact that JJB requires an intervention specialist in both math and language arts in and of itself "demonstrates that she does in fact have "marked" limitation in this domain." (Doc. 9 at 19, emphasis original). Plaintiff contends that "the school records are replete with examples demonstrating this to be the case," (*id.*), but does not cite any specific example or record. Having reviewed all relevant records, the undersigned agrees that the IEPs and other school records reflect JJB's slow processing speed in completing tasks. However, using the whole child approach and considering all of the evidence cited by the

18

ALJ, I do not agree that JJB's processing speed or IEPs mandate a finding of "marked" impairment rather than "less than marked" limitation in this domain. Again, the medical opinions on which the ALJ relied, along with the record as a whole, provide substantial evidence to support the determination that JJB has only "moderate" rather than "marked" limitation in the domain of attending and completing tasks.

### III. Conclusion and Recommendation

In sum, none of the evidence on which Plaintiff relies requires a finding that JJB had "marked" limitations in the referenced domains. Many children with "less than marked" limitations may perform poorly in school and/or require significant additional resources for a variety of reasons that do not equate to a "disability." For the reasons discussed, substantial evidence exists to support the ALJ's determination that JJB's impairment was "less than marked" in acquiring and using information and in attending and completing tasks.

Therefore, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED**, and that this case be **CLOSED.**

                                        */s Stephanie K. Bowman*
                                        Stephanie K. Bowman
                                        United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JERMELLA FIGGS,
on behalf of minor child, J.J.B.,	Case No. 1:17-cv-481

    Plaintiff,	Dlott, J.
                                                                                                                                    Bowman, M.J.
    v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).